E-FILED
Wednesday, 17 July, 2013  07:01:51 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

AVENTINE RENEWABLE ENERGY, INC.,

        Plaintiff,

v.

REDFIELD ENERGY, LLC

        Defendant.

Civ. Action No. _____

# COMPLAINT

Plaintiff, Aventine Renewable Energy, Inc., (the "Plaintiff" or "ARE"), by and through its undersigned counsel, for its complaint against the above-captioned defendant, Redfield Energy, LLC ("Defendant" or "Redfield") hereby alleges upon knowledge with respect to itself and its own acts, and upon information and belief as to all other matters, as follows:

## SUMMARY OF THE ACTION[1]

1.    This is an action against Redfield for breach of contract and declaratory judgment arising from a business relationship between ARE and Redfield. ARE's claims arise from the continuing breaches by Redfield of the Termination Agreement that provided for, among other things, the termination of the Original Agreement, Redfield's obligation to pay the Termination Fee, ARE's sublease of certain railcars to Redfield and Redfield's agreement to fully assume ARE's rights and obligations with respect to the Subleased Railcars and to obtain a release of ARE of such obligations.

2.    In particular, Redfield breached its obligations arising under the Termination Agreement by, among other things: (i) failing to fulfill its obligations with respect to the UTC

---

[1] Capitalized terms used but not otherwise defined in the Summary of the Action section shall have the meanings ascribed to such terms in the body of the Complaint.

01:13911379.2

Subleased Railcars as required by Section 5.C. and Section 5.D. of the Termination Agreement; (ii) failing to indemnify, defend and hold ARE harmless from and against all claims, liabilities, damages, costs and expenses as required by Section 5.F. of the Termination Agreement; and (iii) failing to pay the Termination Fee as required by Section 7 of the Termination Agreement.

3.  As a result, ARE is entitled to offset, in their entirety, the amounts owed by Redfield to ARE on account of Redfield's breaches of the Termination Agreement against the amounts ARE owes to Redfield for the Unpaid True-Up Payment, and to recover damages in excess of the amounts ARE owes to Redfield.

## PARTIES

4.  Plaintiff ARE is a Delaware corporation with its corporate headquarters located and principal place of business located at 1300 S. 2nd Street, Pekin, Illinois 61554. ARE is a leading producer and seller of ethanol and related products and by-products. At all relevant times, ARE conducted its business of producing and selling ethanol and related products in its own right and through its agents, employees and other authorized representatives.

5.  Upon information and belief, Defendant Redfield is a South Dakota limited liability company with its principal place of business located at 38650 171st Street, Redfield, South Dakota. Upon information and belief, Redfield is a producer and seller of fuel grade ethanol. Upon information and belief, at all relevant times, Redfield conducted its business of producing and selling fuel grade ethanol to ARE in its own right and through its agents, employees and other authorized representatives.

## JURISDICTION AND VENUE

6.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because complete diversity exists among the parties and the amount in controversy

01:13911379.2

exceeds $75,000.

7. This Court may properly exercise personal jurisdiction over Defendant Redfield by virtue of Redfield's continuous and systematic contacts with Illinois through its offering for sale and/or sales of ethanol to ARE and its entry into contracts relating to this action with ARE.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

### A. The Termination Agreement and Redfield's Breaches Thereof

9. Redfield produces ethanol and participated in ARE's marketing alliance before ARE's wind-down of such marketing alliance prior to the Petition Date (defined below). Beginning in May 2007, ARE purchased and marketed ethanol produced by Redfield at the Redfield, South Dakota facility. The business relationship between ARE and Redfield was set forth in that certain Ethanol Marketing Agreement dated as of November 10, 2006 (the "Original Agreement").

10. In late 2008 and the beginning of 2009, ARE and Redfield (collectively, the "Parties") agreed to wind-down their business relationship and terminate their respective obligations under the Original Agreement.

11. On January 8, 2009, the Parties entered into the Termination Agreement, a copy of which is attached hereto as Exhibit A.

12. The Termination Agreement provided for, among other things, the termination of the Original Agreement effective as of January 16, 2009 (the "Termination Date"), payment of a termination fee to ARE in the aggregate amount of $87,500 (the "Termination Fee"), ARE's sublease of certain railcars to Redfield, and Redfield's agreement to fully assume ARE's obligations associated with certain identified railcars and to obtain a release of ARE from such

01:13911379.2

3

obligations.

13. Prior to entering into the Termination Agreement, ARE was a party to multiple railcar lease agreements (each a "<u>Railcar Lease</u>" and collectively, the "<u>Railcar Leases</u>") pursuant to which ARE leased railcars from certain third-parties to transport ethanol on behalf of ARE's marketing alliance members, including Redfield.

14. The Railcar Leases are comprised of the following: (i) that certain Car Service Contract dated October 1, 2008, as amended, including riders thereto, with GATX Financial Corporation; (ii) those certain Master Car Service Contracts having various dates, as amended, including riders thereto, with American Railcar Leasing LLC; (iii) that certain Car Leasing Agreement dated July 22, 2004, as amended, including riders thereto, with First Union Rail; and (iv) that certain Union Tank Car Company Car Service Agreement dated August 1, 1991, as amended, including riders thereto (the "<u>UTC Service Agreement</u>"), with Union Tank Car Company ("<u>UTC</u>").

15. Pursuant to, and as consideration for entering into, the Termination Agreement, ARE agreed to sublease certain railcars (collectively, the "<u>Subleased Railcars</u>") to Redfield, all of which ARE had leased from third-party lessors pursuant to the Railcar Leases.

16. Section 5.B. of the Termination Agreement provides, in pertinent part, that:

> Notwithstanding the termination of the Original Agreement, on and after the Termination Date, *ARE hereby subleases to Redfield, and Redfield hereby accepts such sublease from ARE, the [Subleased Railcars] listed on Exhibit A ... The foregoing subleases shall be subject to the terms and conditions of the respective Railcar Leases applicable to the Subleased Railcars, all of which are incorporated herein by reference.* The term of each of the foregoing subleases for each of the Subleased Railcars shall commence upon the Termination Date, and shall expire upon the earlier of (i) expiration of the lease term for such Subleased Railcar under the applicable Railcar Lease or (ii) the date on which all of ARE's lease rights and obligations with respect to such Subleased Railcar is transferred to and assumed by

01:13911379.2

> Redfield as provided in Sections 5.D. and E. below through assignment and/or execution of a new lease contract and riders with the applicable lessor of such Subleased Railcar.

(*See* Termination Agreement at Section 5.B. (emphasis added)).

17. The Subleased Railcars are specifically identified on Exhibit A to the Termination Agreement. As indicated on such exhibit, ARE originally leased 126 of the 163 Subleased Railcars from UTC (collectively, those 126 railcars are the "<u>UTC Subleased Railcars</u>").

18. During the term of the sublease, Redfield was responsible for "payment of the monthly rental rates applicable under the Railcar Leases for the Subleased Railcars, and any and all other costs, charges and expenses due under the Railcar Leases with respect to the Subleased Railcars ...." (*Id.* at Section 5.C.).

19. The Parties further agreed that it was "[t]he intent of the Parties to fully transfer to Redfield, and for Redfield to fully assume, all of ARE's rights and obligations with respect to the Subleased Railcars and to obtain a release of ARE from such obligations from the lessors of such Subleased Railcars, using commercially reasonable efforts, (i) on or before January 31, 2009 with respect to the GATX, ARL and FUR Subleased Railcars, and (ii) as soon as practicable thereafter with respect to the UTC Subleased Railcars ...." (*Id.* at Section 5.D.).

20. The Parties recognized that the process for Redfield obtaining a release for ARE of the obligations with respect to the UTC Subleased Railcars may have required execution of a new lease or three party agreement among UTC, ARE and Redfield. (*Id.* at Section 5.E.).

21. In addition to agreeing to fully assume all of ARE's obligations related to the Subleased Railcars and obtain a release of ARE from such obligations, Redfield also agreed to indemnify, defend and hold ARE harmless from all claims, liabilities and damages resulting

01:13911379.2

5

from any breach by Redfield of the subleases of the Subleased Railcars or any other agreement to which Redfield becomes a party with respect to the Subleased Railcars. (*Id.* at Section 5.F.).

22. Section 5.F. of the Termination Agreement provides that:

> Redfield shall indemnify, defend and hold ARE harmless from and against all claims, liabilities, losses damages, costs and expenses (including reasonable attorneys' fees) arising out of or resulting from any breach by Redfield, its parents, subsidiaries or affiliates, or its or their respective employees, officers, agents or representatives of (i) the subleases of the Subleased Railcars to Redfield hereunder and (ii) any other agreement to which Redfield becomes a party with respect to the Subleased Railcars, including, but not limited to, the New UTC Lease.

(*Id.*).

23. The Termination Agreement further obligated Redfield to pay to ARE the $87,500 Termination Fee as consideration for ARE's agreement to terminate the Original Agreement. (*Id.* at Section 7).

24. The Termination Fee was to be paid by Redfield in four installments. The first installment in the amount of $12,500 was required to be paid on or before the Termination Date. (*Id.*). The three remaining installment payments in the amount of $25,000 each were required to be paid on or before the first of the month beginning in February, 2009 and ending in April, 2009.

25. Any portion of the Termination Fee not paid by Redfield "shall bear interest at the lower of (i) the prime rate published in *The Wall Street Journal* plus 2% per annum, or (ii) the maximum lawful interest rate, from the date due until the date payment is received in full by ARE." (*Id.*).

26. Redfield paid the initial $12,500 Termination Fee installment payment and the $25,000 installment payment for February, 2009. However, Redfield failed to pay the $25,000 installment payment for March, 2009 and the $25,000 installment payment for April, 2009.

Copies of the invoices for the March, 2009 and April, 2009 installment payments are attached hereto as <u>Exhibit B</u>.

27. Accordingly, Redfield breached the Termination Agreement and ARE is entitled to receive the unpaid portion of the Termination Fee ($50,000), plus interest.

**B.  The Chapter 11 Cases and the Union Tank Claim**

28. On April 7, 2009 (the "<u>Petition Date</u>"), ARE and its affiliates (collectively, the "<u>Debtors</u>") each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>").

29. By Order dated May 5, 2009, the Bankruptcy Court approved the Debtors' rejection of, among other things, the riders to the UTC Service Agreement under which ARE had originally leased the UTC Subleased Railcars, effective as of the Petition Date.

30. On September 3, 2009, UTC filed proof of claim number 316 (the "<u>Union Tank Claim</u>"), a copy of which is attached hereto as <u>Exhibit C</u>.

31. Pursuant to the Union Tank Claim, UTC asserted a general unsecured claim against ARE in the total amount of $82,553,987.47 on account of, among other things, certain estimated end charges, railcar cleaning costs and unpaid rental payments for leased railcars.

32. Of the $82,553,987.47 in damages, costs, unpaid rental payments and/or other expenses asserted by UTC against ARE, more than $4.2 million was attributed to the UTC Subleased Railcars.

33. ARE disputed the validity and amount of the Union Tank Claim and subsequently engaged in extensive negotiations with UTC.

01:13911379.2

7

34. The negotiations with UTC resulted in ARE and UTC entering into a stipulation (the "UTC Stipulation") providing for the liquidation and allowance of the Union Tank Claim in the amount of $27,562,095.00 (the "Allowed UTC Claim").

35. On October 3, 2011, the Bankruptcy Court entered an order approving the UTC Stipulation in all respects. A copy of the order (with the UTC Stipulation attached thereto) is attached hereto as Exhibit D.

36. Pursuant to the UTC Stipulation, approximately $1,462,711 of the allowed amount is attributable directly to ARE's liabilities and obligations concerning the UTC Subleased Railcars.

37. The damages asserted by UTC against ARE and ultimately allowed through the UTC Stipulation and Allowed UTC Claim stem, in part, from ARE's purported liabilities and obligations concerning the UTC Subleased Railcars.

38. As noted above, however, ARE subleased the UTC Subleased Railcars to Redfield and Redfield agreed to accept such subleases. (*See* Termination Agreement at Section 5.B.).

39. Redfield was responsible for the payment of monthly rent and any and all other costs, charges and expenses associated with the Subleased Railcars during the term of the sublease. (*Id.* at Section 5.C.)

40. Redfield expressly agreed to "fully assume all of ARE's rights and obligations with respect to the Subleased Railcars and to obtain a release of ARE from such obligations from the lessors of such Subleased Railcars ...." (*Id.* at Section 5.D.).

41. Redfield has failed to fulfill its rental and other payment obligations with respect to the UTC Subleased Railcars, as required by Section 5.C. of the Termination Agreement.

42.     Redfield has further failed to fulfill its obligations with respect to the UTC Subleased Railcars, as required by Section 5.D. of the Termination Agreement.

43.     Redfield has further failed to indemnify, defend and hold ARE harmless from and against all claims, liabilities, damages, costs and expenses arising in connection with the UTC Subleased Railcars, as required by Section 5.F. of the Termination Agreement.

44.     Accordingly, Redfield has failed to fulfill its contractual obligations and has breached the Termination Agreement.

45.     As a result of Redfield's breaches of the Termination Agreement, ARE has suffered damages in excess of $1.5 million.

**C.     American Railcar Leasing Claim**

46.     On August 3, 2009, American Railcar Leasing, LLC ("ARL") filed proof of claim number 189 (the "ARL Claim"), a copy of which is attached hereto as Exhibit E.

47.     Pursuant to the ARL Claim, ARL asserted a general unsecured claim against ARE in the total amount of $327,861.88 on account of certain railcar rental costs, service and repair fees, and mileage equalization charges attributable to certain of the Subleased Railcars identified on Exhibit A to the Termination Agreement that ARE had leased from ARL (such railcars, the "ARL Subleased Railcars").

48.     In accordance with the ARL Claim, the mileage equalization charges (the "Equalization Charges") accounted for approximately $28,022 of the $327,861.88 claimed by ARL. Of the $28,022 in Equalization Charges, approximately $3,215 is attributable to the ARL Subleased Railcars.

49.     Moreover, in accordance with the ARL Claim, the repair fees (the "Repair Fees") attributable to the ARL Subleased Railcars totaled approximately $1,236.

01:13911379.2

9

50.     Redfield was responsible for the payment of monthly rent and any and all other costs, charges and expenses associated with the Subleased Railcars during the term of the sublease, including, without limitation, the Equalization Charges and the Repair Fees. (Termination Agreement at Section 5.C.).

51.     Redfield failed to fulfill its obligations to pay the Equalization Charges and the Repair Fees relating to the ARL Subleased Railcars as required by Section 5.C. of the Termination Agreement.

52.     Accordingly, Redfield has failed to fulfill its contractual obligations and has breached Section 5.C. of the Termination Agreement. Redfield's breach of Section 5.C. of the Termination Agreement in respect of the Equalization Charges and Repair Fees for the ARL Subleased Railcars has caused ARE to suffer damages in excess of $4,451.

53.     As a result of Redfield's breaches of the Termination Agreement relating to the UTC Subleased Railcars and the ARL Subleased Railcars, ARE has suffered damages in excess of $1.5 million.

**D.     Redfield's Claim**

54.     On June 8, 2009, each of the Debtors filed their Schedules of Assets and Liabilities (as amended, collectively, the "Schedules") and Statements of Financial Affairs, and, on July 8, 2009 and September 8, 2009, the Debtors amended the Schedules.

55.     Redfield was listed in the Schedules as holding a general unsecured claim against ARE in the amount of $258,312.93 (the "Claim"). (*See* Docket No. 189 – *In re Aventine Renewable Energy Holdings, Inc. et al.*, Case No. 09-11214 (Bankr. D. Del.) (KG)).

56.     The Claim represents the amounts owed by ARE to Redfield for the January, 2009 true-up payment (the "Unpaid True-Up Payment") under the terms of Paragraph 5.C. of the

01:13911379.2

Original Agreement.

E. **The Adversary Proceedings in the Bankruptcy Court**

57. On December 31, 2012, ARE commenced three actions (the "Adversary Proceedings") in the Bankruptcy Court by filing a complaint (collectively, the "Complaints") against each of Redfield, Glacial Lakes Energy, LLC and Aberdeen Energy, LLC (collectively, the "Defendants").

58. Upon information and belief, Defendants were and remain affiliates, and the same individual served as each Defendant's Chief Executive Officer during the time period relevant to the Complaints.

59. With minor differences, each Complaint sought essentially the same relief against the applicable Defendant based on their breaches of the respective Termination Agreement and each Complaint was based on substantially similar facts and theories.

60. On May 10, 2013, Defendants filed a consolidated motion to dismiss the Complaints (the "Motion") asserting that the Complaints should be dismissed in their entirety because the Bankruptcy Court lacked subject matter jurisdiction and/or the Debtors' plan of reorganization purportedly had failed to preserve ARE's claims against the Defendants.

61. On June 7, 2013, ARE filed its answering brief in opposition to the Motion.

62. On July 16, 2013, the Bankruptcy Court entered an order on the Motion (the "Dismissal Order"). A copy of the Dismissal Order is attached hereto as Exhibit F.

63. Pursuant to the Dismissal Order, the Bankruptcy Court dismissed the Adversary Proceedings for lack of subject matter jurisdiction on the grounds that "the plan does not provide for the requisite close nexus that would enable the [Bankruptcy] Court, as a bankruptcy court with limited jurisdiction, to adjudicate the claims." (Dismissal Order at 4).

01:13911379.2

64. The Bankruptcy Court also held that ARE's causes of action against Redfield and the other Defendants were <u>not</u> barred because "the plan adequately preserves the causes of action asserted in the Complaints by vesting all prepetition causes of action in the reorganized debtors . . ." (*Id.*)

## COUNT I

### (Breach of Contract)

65. Plaintiff ARE repeats and incorporates by reference its allegations contained in Paragraphs 1 through 64 above as if fully set forth herein.

66. The Termination Agreement constitutes a valid and enforceable agreement between ARE and Redfield.

67. Redfield breached the Termination Agreement by failing to fulfill its obligations in respect of the Equalization Charges and Repair Fees relating to the ARL Subleased Railcars as required by Section 5.C. of the Termination Agreement.

68. Redfield breached the Termination Agreement by failing to fulfill its monthly rent payment obligations associated with the UTC Subleased Railcars as required by Section 5.C. of the Termination Agreement.

69. Redfield breached the Termination Agreement by failing to fulfill its obligations associated with the UTC Subleased Railcars as required by Section 5.D. of the Termination Agreement.

70. Redfield breached the Termination Agreement by failing to indemnify, defend and hold ARE harmless from all claims, liabilities and damages resulting from any breach by Redfield (or any of its affiliates, agents, employees) of the subleases of the Subleased Railcars to Redfield as required by Section 5.F. of the Termination Agreement.

71. Redfield breached the Termination Agreement by failing to pay the Termination Fee, including the applicable interest, to ARE as required by Section 7 of the Termination Agreement.

72. As a result of Redfield's breaches of the Termination Agreement, ARE has suffered damages and losses, including, without limitation, direct costs relating to obligations arising under and related to the UTC Subleased Railcars in an amount exceeding $1.5 million and damages resulting from the failure to pay the $50,000 Termination Fee.

73. ARE is entitled to recover damages from Redfield in excess of ARE's liability on account of the Unpaid True-Up Payment.

## COUNT II

**(Declaratory Judgment Regarding ARE's Right to Setoff)**

74. Plaintiff ARE repeats and incorporates by reference its allegations contained in Paragraphs 1 through 73 above as if fully set forth herein.

75. The Termination Agreement constitutes a valid and enforceable agreement between ARE and Redfield.

76. Pursuant to applicable New York state law, ARE is entitled to offset the more than $1.5 million in damages it incurred as result of Redfield's breaches of the Termination Agreement against the amounts it owes Redfield for the Unpaid True-Up Payment.

77. An actual controversy exists between the Parties regarding ARE's right to apply the damages incurred as a result of Redfield's breaches of the Termination Agreement to offset, in their entirety, the amounts owed to Redfield for the Unpaid True-Up Payment.

78. A prompt judicial determination of the respective rights and duties of the parties in these respects is necessary and appropriate.

## COUNT III

### (Attorneys' Fees)

79. Plaintiff ARE repeats and incorporates by reference its allegations contained in Paragraphs 1 through 78 above as if fully set forth herein.

80. The Termination Agreement constitutes a valid and enforceable agreement between ARE and Redfield.

81. Redfield breached its obligations under Section 5.F. of the Termination Agreement by failing to indemnify, defend and hold ARE harmless from and against all claims, liabilities, damages, costs and expenses (including reasonable attorneys' fees) arising out of or in connection with any breach by Redfield, its affiliates, or its or their respective employees or agents of (i) the subleases of the Subleased Railcars to Redfield hereunder or (ii) any other agreement to which Redfield becomes a party with respect to the Subleased Railcars.

82. As a result of such breaches, ARE should be awarded its attorneys' fees and costs incurred in bringing and pursuing this action, as provided for in Section 5.F. of the Termination Agreement.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiff ARE demands judgment against Defendant Redfield as follows:

A. An award of damages in an amount to be determined at trial, including more than $1.5 million incurred as a result of Redfield's breaches of the Termination Agreement and such additional amount as is determined by the Court in order to sufficiently and fully compensate ARE for the damages and losses that it has suffered as result of Redfield's actions.

01:13911379.2

B.  An order declaring that ARE is entitled to offset the more than $1.4 million in damages it incurred as result of Redfield's breaches of the Termination Agreement against the amounts owed to Redfield ($258,312.93) for the Unpaid True-Up Payment.

C.  An order declaring that all amounts ARE owes to Redfield ($258,312.93) have been paid in full due to the offset of the damages incurred by ARE against the Unpaid True-Up Payment.

D.  An award of damages against Redfield consisting of the net excess of the damages incurred by ARE as a result of Redfield's breaches of the Termination Agreement minus the amounts owed to Redfield ($258,312.93) for the Unpaid True-Up Payment.

E.  Payment of ARE's attorneys' fees and expenses incurred in connection with this action.

F.  Such other or further relief as the Court finds just and equitable.

By: /s/ Thomas W. O'Neal
Thomas W. O'Neal
Attorney for the Plaintiff

Thomas W. O'Neal (ARDC No. 3127563)
Howard & Howard Attorneys, P.C.
211 Fulton Street, Suite 600
Peoria, IL 61602
Telephone:   (309) 672-1483
Facsimile:   (309) 672-1568
E-mail:  toneal@howardandhoward.com

01:13911379.2

15